IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ALLEN WILLIAMS, et al.,               )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )          1:00CV00379
                                      )
ALUMINUM COMPANY OF AMERICA,          )
                                      )
                    Defendant.        )
_____     )

MEMORANDUM OPINION

Tilley, Chief Judge

        This case arises out of a dispute between the Defendant Aluminum

Company of America ("Alcoa") and sixty-seven African-American Plaintiffs over

allegations of racial discrimination at Alcoa's plant in Badin, North Carolina.  The

majority of the Plaintiffs in this case have settled their claims against Alcoa.  The

matter is now before the Court on Alcoa's Motion for Summary Judgment [Doc. #

75] as to Plaintiff Emory Johnson, Jr.  For the reasons set forth below, this Motion

will be GRANTED.

                                      I.

        On April 14, 2000, sixty-seven current and former African-American

employees of Alcoa filed the present case in the Middle District of North Carolina,

alleging racial discrimination, harassment, and retaliation in violation of 42 U.S.C. §

1981.  Alcoa moved for summary judgment as to fifty-six of the plaintiffs on

February 18, 2003 [Doc. # 75]. In its summary judgment brief, Alcoa addressed those claims that were common to the majority of the Plaintiffs as well as those claims specific to individual Plaintiffs. The Plaintiffs filed their Response in Opposition on June 4, 2003 [Doc. # 108] and Alcoa filed its Reply on July 15, 2003 [Doc. # 114]. On May 14, 2004, the Court directed the Plaintiffs to submit a Supplemental Response Brief in which they were to ensure that all citations to the record "include references to the particular point for which they are cited, including specific page numbers on which the relevant evidence can be found" in accordance with Local Rule 56.1. See Letter to Counsel, May 14, 2004. On May 24, 2004, the Plaintiffs submitted a Supplemental Response Brief [Doc. # 120] and on June 1, 2004, Alcoa filed a Response in which it asserted that the Plaintiffs' Supplemental Response Brief failed to comply with the Court's mandate [Doc. # 121]. Alcoa submitted a chart as Attachment A to the May 24th filing in which it summarized the Plaintiffs' errors. The Court issued an Order dated June 22, 2004 in which it required the Plaintiffs to address each of the errors identified by Alcoa [Doc. # 122]. The Plaintiffs submitted a filing purporting to comply with the Court's Order on July 6, 2004 [Doc. # 125].

On November 23, 2004, Mr. Roman C. Pibl, counsel for the Plaintiffs, notified the Court that he was no longer able to represent the Plaintiffs in this case [Doc. # 126]. The Court therefore issued an Order staying this case for sixty days [Doc. # 127]. Mr. Julius S. Chambers filed an appearance for the majority of the

2

Plaintiffs on February 14, 2005 [Doc. # 128].  On June 8, 2005, the Court held a

status conference at which it was determined that, because the record in this case

was relatively large and in a state of some disarray, the case would proceed

through a series of summary judgment hearings.  At each hearing, the parties

would argue the merits of Alcoa's Motion for Summary Judgment as to each

individual Plaintiff and point to evidence in the record that would support or oppose

that Plaintiff's claims.

II.

On July 28, 2006, the Court held a hearing during which each party

presented its position as to whether summary judgment was appropriate in the

case of Plaintiff Emory Johnson, Jr.  In particular, the parties discussed the

incidents of alleged discrimination that Mr. Johnson described during his

deposition.[1]  Based upon Mr. Johnson's deposition testimony, counsel's

arguments, briefs, and the record, the undisputed facts surrounding each of these

incidents is described below.

The Defendant Alcoa is a producer of primary aluminum, fabricated

aluminum, and alumina.  Alcoa began producing aluminum at its plant in Badin,

North Carolina, the so-called "Badin Works," in 1917.[2]  Mr Johnson was employed

-----

[1] During his deposition, Mr. Johnson was asked to describe each incident of alleged discrimination that he experienced while employed at Alcoa.

[2] The Badin Works was, until recently, a primary aluminum smelter. "Smelting" refers to the process by which alumina is transformed into molten

3

by Alcoa from approximately 1969 to 2002 and most recently worked as a Smelter Operator in the Potroom Department at the Badin Works.[3]  Because the Badin Works was a unionized facility, the hourly workforce, of which Mr. Johnson was a member, was subject to the terms and conditions of a Collective Bargaining Agreement (the "CBA") between Alcoa and the International Union, United Steelworkers of America (the "Union").  The CBA provided for two methods of filing a grievance with the company.  An employee could either file a complaint with the Badin Civil Rights Committee ("BCRC") or submit to Alcoa's standard grievance procedure.  The BCRC, whose members were drawn from both management and union employees, was established at each Alcoa facility to review complaints regarding civil rights.  In the event the BCRC could not resolve a matter, the matter was referred to Alcoa's standard grievance process.

Historically, the Badin Works has prohibited the display of the Confederate flag *inside* the plant.  In August of 1999, Plaintiff Richard Leak observed a Confederate flag displayed on a vehicle parked in the parking lot directly in front of

aluminum metal.

[3] The Badin Works was organized into a number of different departments which operated together to produce aluminum.  The aluminum smelting process begins in the Electrode Department where rodded anodes (blocks of carbon) are produced.  The anodes are then taken to the Potroom Department where they are combined with alumina and electricity to produce molten aluminum.  The molten aluminum is then sent to the Ingot Department where it is converted into different grades of aluminum.  In addition to these departments, three other departments provide support for the smelting process: the Potlining, Service, and Maintenance Departments.

4

the plant's administrative building (the "administrative parking lot").[4]  The flag was displayed on a license plate on the front bumper of a truck.  Mr. Leak (1) complained to Steve Griffin, a Human Resource Assistant, and (2) filed a complaint with the BCRC on August 23, 1999 asserting that he was offended by the presence of the Confederate flag on a vehicle in the administrative parking lot.  As the result of an investigation, Alcoa learned that the vehicle in question was owned by a salaried employee, Ken Casper.  An Alcoa Supervisor then instructed Mr. Casper to remove the license plate bearing the Confederate flag from his vehicle.

In April of 2000, Plaintiff Allen Williams complained about the presence of the Confederate flag on vehicles in the parking lot across the street from the Badin Works (the "main parking lot").[5]  Mr. Williams canvassed the main parking lot and assembled a list of the license plate numbers of all the vehicles that displayed the Confederate flag.  He gave the list to Bruce Cox, the plant manager, and Robert Persons, the Human Resource Director.

---

[4] There are two parking lots involved in this issue: The "administrative parking lot" is located directly in front of the Badin Works' administrative building. The "main parking lot" is located directly across the street from the Badin Works and is capable of holding approximately 300 vehicles.  Both parking lots are located outside the plant's gates and are open to both employees of Alcoa and the general public.

[5] During his deposition, Mr. Williams testified that he saw the Confederate flag on "six or seven vehicles."  (Williams Dep. 247.)  The Confederate flag was displayed on the front bumper of most of these vehicles.  (Id.)  However, Mr. Williams saw "one or two" vehicles with a Confederate flag "draped over their back windshield" on the inside of the vehicle.  (Id.)

5

Alcoa took the following steps to address the situation: (1) it requested assistance from the Union; (2) Mr. Cox conducted interviews with several African-American employees about the presence of the Confederate flag on vehicles in the two parking lots; and (3) Dana Kessler, a Human Resource Assistant, met with the white employees who had displayed the Confederate flag on their vehicles. Alcoa learned that many of its African-American employees were offended by the presence of the Confederate flag on vehicles in the plant's parking lots. Therefore, when the white employees refused to remove the flag from their vehicles, Alcoa decided to extend the ban on the Confederate flag to include the plant's parking areas. In response to the extension of the ban, three white employees filed grievances with the Union alleging that this action constituted discrimination against Confederate Southern Americans.

On June 22, 2000, a pro-flag protest took place in front of the Badin Works in response to Alcoa's extension of the ban to the plant's parking lots. The protest was organized by representatives of the Sons of Confederate Veterans and Southern Heritage of the Carolinas. A number of demonstrations followed this initial protest, but they appear to have attracted fewer protesters.

In order to end the protests, Alcoa hired an outside consultant recognized in diversity training to conduct mediation sessions between those employees who supported the display of the Confederate flag and those who opposed it. Alcoa also began discussions with representatives of Southern Heritage of the Carolinas,

6

one of the entities that organized the June 22, 2000 protest. As a result of these discussions, an agreement was reached to end the protests. The protesters agreed to discontinue their picketing, letter writing and email campaigns. In return, Alcoa agreed (1) to add a section to its diversity training program concerning the Confederate flag and (2) to permit vehicles to use the plant's parking lots that displayed either (a) a North Carolina state-issued license plate bearing the symbol of the Sons of Confederate Veterans or (b) certain other historical flags representative of Southern heritage. However, the ban on the Confederate flag continued in both the Badin Works and the plant's two parking lots.

The second issue discussed by Mr. Johnson during his deposition concerned the presence of KKK symbols and other racially offensive symbols in the Badin Works. Mr. Johnson saw KKK symbols in the Potroom on three occasions during the early to mid-1990s. He first saw this symbol after another employee told him to look for it on a rodded anode in the Potroom. Mr. Johnson did not see the symbol again and believes the employee who told him about it reported the presence of the symbol to management. Mr. Johnson saw the second KKK symbol inside an open locker in the washroom. He does not know who the locker belonged to and did not report seeing the symbol to anyone. Mr. Johnson saw the third KKK symbol on a beam in the Potroom. The symbol was not on the beam the next time Mr. Johnson reported to work and he did not report seeing it to anyone. Finally, Mr. Johnson saw a hangman's noose hanging on a wall at one end of the

Potroom.  Mr. Johnson did not immediately report the presence of the noose to management, but did not see the noose on the wall again.

Mr. Johnson's third allegation of discriminatory treatment concerns the allocation of overtime assignments among white and black employees at the Badin Works.  The assignment of overtime is described in Article V, § 15, ¶ B of the CBA.  Pursuant to the CBA, overtime is offered on a rotating basis so that every employee receives an equal opportunity to work overtime hours.  The CBA requires that overtime is first offered to those employees with the least amount of overtime on the overtime list.  If that employee is offered the opportunity to work overtime and declines, his or her "account" is charged for the opportunity just as it would have been if the time were actually worked.  Alcoa may deviate from the overtime list if there is a valid basis for doing so, such as maintaining continuity with a task already begun, a need for special skills, and the availability of an employee for overtime which becomes available on short notice.  If such a deviation is challenged through the grievance procedure, the company bears the burden of proving the validity of its overtime assignment.  Sometime in 1999, Mr. Johnson complained to his Supervisor that a white employee, Reggie Almond, was given an overtime shift that he thought he was entitled to based on the overtime list.

Mr. Johnson's next complaint concerns his attempt to gain admission to Alcoa's Accelerated Apprenticeship Program.  In December of 1999, several Alcoa craft and maintenance employees opted for an early retirement package offered by

the company.  In order to fill the positions left vacant by these early retirees, Alcoa created an Accelerated Apprenticeship Program (the "Accelerated Program").  The Accelerated Program was designed to train employees within a period of 19-22 months.  Thus, the Accelerated Program enabled Alcoa to hire from within its own workforce to replace retired craftsmen without having to wait for employees to graduate from the traditional three-year long Apprenticeship Program.  Because of this shorter training period, qualified applicants for the Accelerated Program had to demonstrate either prior training or experience in craft skills, welding, pipe fitting, hydraulic maintenance, auto mechanics, electrical maintenance or a similar trade. In order to be considered for the Accelerated Program, an applicant was required to submit a "blue sheet,"[6] a resume, copies of any training certificates, and copies of any supporting documentation related to relevant education or work experience to the Human Resources Department by December 6, 1999.  Before it began receiving applications for the Accelerated Program, Alcoa determined that it needed to place six apprentices into the Accelerated Program.  Thirty-four employees applied to the Accelerated Program.  Ten of the applicants were black and twenty-four were white.  Ultimately, three African-American employees and three white employees were accepted into the Accelerated Program.  Mr. Johnson applied for

---

[6] A "blue sheet" was a one-page form entitled "Craft Opportunity Application" which asked the applicant to identify his current job, current supervisor, telephone number, the craft position he or she was interested in, any previous craft experience, education, or training received within the last five years and any other relevant knowledge.  (See Def.'s Mem. Supp. Summ. J., Ex. 65.)

the Accelerated Program in 1999, but was not given a position.

Mr. Johnson's next allegation concerns an incident that occurred sometime in 1999. Mr. Johnson was on the phone in the Anode Department when a man approached him and attempted to get his attention. When Mr. Johnson got off the phone, the man told Mr. Johnson that he was not wearing the required protective eye equipment. Mr. Johnson ignored the man and walked off. Later that day, Mr. Johnson's Supervisor told him that he was to meet with Larry Phillips, the Superintendent of the Potrooms, at 2:45 p.m. Mr. Johnson arrived in Mr. Phillips' office along with five people, including several union representatives, sometime around 2:45 p.m. Mr. Phillips complained about Mr. Johnson having so many people with him so Mr. Johnson left his office. Mr. Phillips followed Mr. Johnson out of his office and requested that he return so that they could continue the meeting. Mr. Johnson returned with just three union representatives.

Mr. Phillips told Mr. Johnson that a Supervisor had complained to him that Mr. Johnson was not wearing protective glasses in the Anode Department and when the Supervisor attempted to confront Mr. Johnson, Mr Johnson had told him to "kiss my ass" and walked off. Mr. Johnson told Mr. Phillips that he thought this Supervisor should be present at the meeting. Mr. Phillips then called the Supervisor, only to learn that he had already left for the day. Mr. Phillips told Mr. Johnson that he wanted to hear his side of the story, but Mr. Johnson insisted the Supervisor be present at the meeting. At 3 p.m., a whistle blew indicating the end

10

of the shift.  Mr. Johnson got up to leave, telling Mr. Phillips that he "had more important things to do" and that he should continue his investigation into the incident.  Mr. Johnson then left the Badin Works.  When he returned to the plant later that evening for the midnight shift, Mr. Phillips told him he needed to see him.  However, Mr. Johnson had forgotten his lunch so he returned to his car before going to Mr. Phillips' office.  When he walked back to the plant, Mr. Phillips informed him that he was giving him a five day suspension for insubordination and interfering with an investigation.

The final incident described by Mr. Johnson during his deposition occurred in May of 2000.  Mr. Johnson was dozing in the canteen around the time of a shift change.  A white co-worker, Mr. Ricky Tolbert, kicked Mr. Johnson's foot while he was sleeping in order to get his attention.  Mr. Johnson got upset and told Mr. Tolbert that he did not appreciate being kicked.  Mr. Tolbert responded that he had not meant any harm.  After leaving the canteen, Mr. Johnson went directly to his Supervisor, Mr. George Burleson.  Mr. Burleson said he would say something to Mr. Tolbert about the incident but failed to do so.  Mr. Johnson then went to Mr. Phillips.  When Mr. Phillips asked him what he wanted him to do about Mr. Tolbert's conduct, Mr. Johnson replied that he didn't think Mr. Phillips would end up doing anything about the incident because he had heard that someone in Alcoa's management had said to a white employee, "You better be glad you ain't a black man."  (Johnson Dep. 105.)  Mr. Phillips then said that he had been

"misinterpreted" when he made that statement. (Id.) Mr. Johnson was surprised that Mr. Phillips admitted to making the statement because he did not know who had originally made the statement, just that it was someone in management. Mr. Phillips then asked Mr. Tolbert if he had kicked Mr. Johnson and why he did so. Mr. Tolbert responded that he nudged Mr. Johnson on the foot in order to get his attention. After discussing the incident further, Mr. Phillips chose not to discipline Mr. Tolbert.

III.

Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those facts identified by the controlling law as essential elements of the claims asserted by the parties. Thus, the materiality of a fact depends on whether the existence of that fact could cause a jury to reach a different outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). A genuine issue of material fact exists if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. Anderson, 477 U.S. at 248. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must view the facts

12

and the inferences reasonably to be drawn from them in the light most favorable to the nonmoving party.  See Fed. R. Civ. P. 56(e).  Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence.  Anderson, 477 U.S. at 249.  In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  The party opposing the motion may not rest upon its pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor.  Id. at 248.

In order to survive a motion for summary judgment, a plaintiff under § 1981 may proceed through two avenues of proof.  Diamond v. Colonial Life & Accident Ins. Co.,416 F.3d 310, 318 (4th Cir. 2005).  The plaintiff may provide "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision."  Id.  Or, in the absence of such evidence, the plaintiff may proceed under the burden-shifting method of proof established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Id.

Under McDonnell Douglas, a plaintiff's prima facie case of discrimination creates an inference that the employment action was based on unlawful discrimination.  The elements of a prima facie case differ slightly depending on the nature of the challenged employment action.  For example, in order to establish a

13

prima facie case in the context of a failure to promote claim, a plaintiff must show that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) was rejected under circumstances giving rise to an inference of unlawful discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994); see also Gairola v. Comm. of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) (noting that the elements of a prima facie case of discrimination are the same under Title VII and § 1981). To establish a prima facie case of discriminatory discipline, the plaintiff must show (1) he is a member of a protected class, (2) he engaged in misconduct as serious as that of an employee who was not a member of a protected class and (2) the employer imposed harsher disciplinary measures against the plaintiff than against employees outside the protected class. Carter, 33 F.3d at 460.

If the plaintiff meets this initial burden, a presumption of discrimination arises, and the burden shifts to the defendant to produce, but not to prove, a "legitimate, nondiscriminatory reason" for its decision. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the presumption of discrimination that arose from the prima facie case disappears, and the burden of proof is left with the plaintiff to show that the employer acted with a discriminatory intent and that its proffered explanation was a pretext for discrimination. Id. at 252-53. However, if a plaintiff fails to establish a prima facie case of discrimination or fails to raise a genuine factual dispute concerning the

14

employer's non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment.  Henson v. Liggett Group, Inc., 61 F.3d 270, 275 (4th Cir.1995).

IV.

During the July 28, 2006 summary judgment hearing, Mr. Johnson asserted that the incidents he described in his deposition constitute a pattern or practice of discrimination that Alcoa permitted to occur at the Badin Works.  Because pattern or practice cases involve a different method of proof than the McDonnell Douglas burden-shifting scheme set out above, see Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759-60 (4th Cir. 1998), vacated and remanded in part on other grounds, 527 U.S. 1031 (1999), the Court will address this argument before discussing Mr. Johnson's individual claims.

In  Lowery v. Circuit City Stores, Inc., the Fourth Circuit held that an individual plaintiff could not pursue a cause of action based on a pattern or practice of discrimination or invoke the method of proof scheme described in Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36 (1977).  158 F.3d at 761.  In so holding, the Lowery court noted:

> The Supreme Court has never applied the Teamsters method of proof
> to a private, non-class suit charging employment discrimination.
> Rather, the Court has noted that there is a 'manifest' and 'crucial'
> difference between an individual's claim of discrimination and a class
> action alleging a general pattern or practice of discrimination.  In a
> class action pattern or practice case, the plaintiffs first litigate the
> common question of fact, i.e., whether the employer utilized a pattern
> or practice which discriminated against the class.  When the class

15

> plaintiffs prove the existence of a discriminatory practice, then that finding benefits them in the adjudication of individual claims by creating a presumption that the individual class members were victims of the discriminatory practice. On the other hand, an individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance. . . . The Supreme Court has never indicated that an inference of discrimination should arise in an individual case until the plaintiff has proved *all* elements of a prima facie case.

158 F.3d at 761 (citations omitted) (emphasis in original).

Mr. Johnson appears to contend that because many of the other Plaintiffs in this case have alleged discrimination with regards to some of the same issues that he has raised (namely, the Confederate flag incident, the allocation of overtime, and the Accelerated Apprenticeship Program), this is sufficient evidence of a pattern or practice of discrimination to allow him to proceed under the <u>Teamsters</u> method of proof. However, "[s]imply alleging the existence of a pattern or practice of discrimination does not . . . automatically give rise to the <u>Teamsters</u> presumption – the presumption arises only when the evidence establishes that a pattern or practice of discrimination exists." <u>Muhammed v. Giant Food Inc.</u>, 2004 WL 1795358, at *4 (4th Cir. Aug. 12, 2004) (unpublished opinion) (citing <u>Cooper v. Fed. Reserve Bank of Richmond</u>, 467 U.S. 867, 875 (1984)). Mr. Johnson has not provided any evidence that discrimination is Alcoa's "standard operating procedure" and thus is not entitled to a presumption that he has been discriminated against. <u>See</u> <u>Teamsters</u>, 431 U.S. at 336 (holding that plaintiff class must

16

establish that "discrimination is the company's standard operating procedure – the regular rather than the unusual practice" in order for presumption to arise that individual class members have been discriminated against); see also Muhammad, 2004 WL 1795358, at *4 ("[A] party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of material fact."); Coker v. Charleston County School Dist., 1993 WL 309580, at *6 (4th Cir. Aug. 16, 1993) (unpublished opinion) (affirming district court's grant of summary judgment to defendant on plaintiffs' pattern or practice claim because plaintiffs failed to provide sufficient evidence that discrimination was defendant's standard operating procedure when plaintiffs only provided deposition testimony of three plaintiffs along with flawed statistical evidence in support of this allegation).  He must therefore proceed under the McDonnell Douglas framework and establish a prima facie case of discrimination as to each of the alleged incidents of discrimination that he described during his deposition.

V.

During his deposition, Mr. Johnson discussed several incidents of alleged discrimination which took place in the 1980s and early 1990s.  (See Johnson Dep. 32-62, 163-167, 167-168, 174-177.)  Alcoa contends that these events are barred by the four year statute of limitations applicable to discrimination claims brought under 42 U.S.C. § 1981.  See Jones v. R.R. Donnelly & Sons Co., 541

17

U.S. 369 (2004). However, Mr. Johnson maintains that these incidents are part of a "pattern or practice" of discrimination and as such are not time-barred.

In Williams v. Giant Foods, the Fourth Circuit rejected a similar argument. 370 F.3d 423, 429 (4th Cir. 2004). The court held that even if the plaintiff were correct in asserting that her employer's failures to promote her "were part of a broader pattern or practice of discrimination, those failures to promote remain discrete acts of discrimination." Id. As discrete acts of discrimination, each individual incident is subject to the applicable statute of limitations period. Id. at 429-30. Therefore, under Williams, those events Mr. Johnson describes in his deposition that took place prior to April 14, 1996 are time-barred[7] and will not be considered in determining whether Mr. Johnson has established a prima facie case with regard to his remaining claims.

The remaining events discussed by Mr. Johnson in his deposition fall into four categories: hostile work environment claims, a discriminatory assignment of overtime claim, a failure to promote claim, and a claim of discriminatory discipline. Each is discussed below.

A.

In order to demonstrate a hostile work environment, a plaintiff must show he was the subject of conduct that was: (1) unwelcome; (2) based on race; (3)

_____

[7] The Plaintiffs filed this case on April 14, 2000. Thus, only those discriminatory acts occurring after April 14, 1996 are not barred by the applicable statute of limitations. See Jones, 541 U.S. 369 (2004).

sufficiently severe and pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). In the present case, even assuming that Mr. Johnson has satisfied the first two elements of a hostile work environment claim, he has failed to provide sufficient evidence that (1) the harassment was sufficiently severe and pervasive to alter the conditions of his employment and (2) there is some basis for imposing liability on Alcoa.

In determining whether the alleged harassment is "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," a district court looks to a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Belton v. City of Charlotte, 2006 WL 1444394, at *12 (4th Cir. May 23, 2006) (unpublished opinion) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). The harassment must be both objectively and subjectively severe and pervasive. Harris, 510 U.S. at 21. Whether the harassment is objectively severe or pervasive is judged from the perspective of a reasonable person in the plaintiff's position. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

With regard to the presence of the confederate flag on Alcoa property, neither party disputes that Alcoa banned the flag in the plant. Thus, at issue for

19

purposes of the hostile work environment claim are (1) the presence of one flag on a vehicle in the administrative parking lot in 1999, (2) the presence of a number of flags on vehicles in the main parking lot in 2000, and (3) the protests that followed Alcoa's decision to extend the plant-wide ban on the flag to the parking lots.  Mr. Johnson has not alleged that any of these incidents unreasonably interfered with his work performance.  Indeed, he has not alleged that he even saw any of the protestors outside of the Badin Works.[8]  (See Johnson Dep. 142-155.)  Thus, the evidence before the Court on this issue does not support a finding that these incidents were "sufficiently severe and pervasive to alter the terms of [Mr. Johnson's] employment and create an abusive atmosphere."  Cf. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (finding plaintiff had met the severe and pervasive prong of a hostile work environment claim where plaintiff was "exposed on a continuous daily basis to . . . racist comments concerning African Americans" for more than two years).

Moreover, in cases where an employee is harassed by a coworker, an employer may only be held liable if the employer knew or should have known about the harassment and failed to take effective action to stop it.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759 (1998).  Thus, an employer is liable if the harassing conduct has been allowed to occur because of its own negligence.  Id.

---

[8] The Plaintiffs' Response brief does not cite to any evidence of the number or frequency of the pro-flag protests.  During the summary judgment hearing, Plaintiffs' counsel did not point to any evidence in the record on this issue.

In the present case, once Alcoa was alerted to the presence of the Confederate flag in the administrative and main parking lots, it took a number of steps to address the concerns of its African American employees: (1) in 1999, when Plaintiff Richard Leake complained about the presence of the flag on a vehicle in the administrative parking lot, the employee who owned the vehicle was instructed to remove the flag; (2) in 2000, when Plaintiff Allen Williams gave Alcoa a list of vehicles displaying the flag in the main parking lot, members of Alcoa's management (a) conducted interviews with several African-American employees about the presence of the Confederate flag in the two parking lots, (b) met with the white employees who had displayed the Confederate flag on their vehicles and (c) ultimately banned the flag from the both the plant and the two parking lots; (3) in response to protests by pro-flag groups outside the Badin Works, Alcoa (a) hired an outside consultant specializing in diversity training, (b) met with the protesters in an effort to end the controversy, and (c) ultimately reached an agreement with the protesters through which the ban on the Confederate flag continued to exist in both the plant and the two parking lots.  Given the many steps that Alcoa took to address this situation, Mr. Johnson cannot contend that it failed to take effective action to stop the harassment.  See Mikels v. City of Durham, N.C., 183 F.3d 323, 332 (4th Cir. 1999) (providing that, in cases of co-worker harassment, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop [the harassing conduct]").

Case 1:00-cv-00379-NCT   Document 224   Filed 08/29/06   Page 21 of 34

Mr. Johnson also contends that Alcoa's response to the protests over the extension of the ban on the Confederate flag to the parking lots was a form of retaliation against him. During his deposition, he testified, "I feel like that they retaliated because of the fact they violated the company policy by having the rebel flag back into the parking lot on employees' vehicles." (Johnson Dep. 141.) Apparently, Mr. Johnson is referring to the agreement the company reached with the protesters allowing the North Carolina state-issued license plate bearing the symbol of the Sons of Confederate Veterans to be displayed on vehicles in the company's parking lots. He contends that this agreement constituted a form of retaliation against him for complaining about the presence of the flag in the plant's parking lots. (Id. at 144-45.)

In order to state a prima facie case of retaliation, Mr. Johnson must establish that (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) a causal connection exists between the protected activity and the asserted adverse employment action. Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997). The Supreme Court has held that in the context of retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006). Thus, the adverse employment

action must be such that it would have dissuaded a reasonable person in Mr.

Johnson's position from filing further charges of discrimination. Alcoa's decision

to allow employees to display a state-issued license plate on their vehicles while

parked in the company's parking lots cannot be found to be so "materially adverse"

to Mr. Johnson that it would have dissuaded him from filing further complaints.

Cf. Burlington N. & Santa Fe Ry. Co., 126 S. Ct. at 2417 (finding that employer's

reassignment of plaintiff to more arduous, less prestigious position and imposition

of a 37-day suspension without pay on plaintiff (who was later reinstated with

backpay) was sufficiently "materially adverse" to plaintiff to support a claim of

retaliation).

With regard to the presence of KKK symbols and a hangman's noose on

Alcoa property, while these symbols are most certainly offensive, Mr. Johnson has

failed to show that their presence was sufficiently severe and pervasive to alter the

conditions of his employment or that there is any basis for imposing liability on

Alcoa for the presence of these symbols.[9]   During his deposition, Mr. Johnson

_____

[9] There is also some question as to whether Mr. Johnson saw the KKK
symbols at the Badin Works within the applicable statute of limitations period, that
is after April 14, 1996. With regard to the first symbol, he testified, "I can't recall
what year it was but it was about. It was in the '90's if I'm not mistaken, '95 or
'94." (Johnson Dep. 123.) Mr. Johnson saw both the symbol in the washroom
and the one on the beam in the Potroom in the "early '90s." (Id. at 175-76.) With
regard to the hangman's noose, Mr. Johnson says, "I guess that was in the middle
of '90's, '97 somewhere along there. That might have been in the '80's. I can't
remember." (Id. at 125.) However, for the purposes of evaluating Alcoa's Motion
for Summary Judgment, the Court will consider Mr. Johnson's testimony in the
light most favorable to the non-moving party and assume that these incidents are

stated that he only saw the first KKK symbol because another employee told him about it and that he had "no idea" as to how long the symbol stayed there. (Johnson Dep. 124.)  The second KKK symbol was written inside a locker in the Washroom, (id. at 174), and the third was written on a beam in the Potroom (id. at 175-76).  It appears that Mr. Johnson did not have an occasion to see the symbol in the locker again, (id. at 175) and the symbol on the beam was gone the day after Mr. Johnson first saw it, (id. at 177).  Similarly, Mr. Johnson also reported that the hangman's noose was gone the day after he saw it.  (Id. at 126.)

In addition, Mr. Johnson has not put forward any evidence that Alcoa failed to act when alerted to the presence of these items in the Badin Works.  See Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 334 (4th Cir. 2003) (holding that an employer may only be liable for co-worker harassment "if it knew or should have known about the harassment and failed to take effective action to stop it").  With regard to the first KKK symbol, Mr. Johnson did not report its presence to anyone because he thought another employee had reported it to management.  (Id. at 123-24.)  Moreover, he does not know how long the symbol stayed on the anode.  (Id. at 123.)  Nor did Mr. Johnson report the second or third KKK symbols that he saw to anyone in Alcoa management.  (Id. at 175-76.)  It is also unclear

---

not barred by the statute of limitations.  Cf. Carter, 33 F.3d at 461-62 (noting that where plaintiff's testimony was "not substantiated by accounts of specific dates, times or circumstances . . . [s]uch general allegations do not suffice to establish an actionable claim of harassment.").

whether Mr. Johnson reported seeing the hangman's noose to anyone at Alcoa. During his deposition when asked if he reported it, he responded: "No, I didn't. I just seen it there and at the time, I didn't realize that, you know, it was important to report it. But it was two or three days later or maybe a week and I went to my supervisor, which was Donny Herring at the time, and I brought it to his attention." (Id. at 125-26.) Significantly, Alcoa had an internal grievance procedure in place, including the BCRC, a committee designed specifically to review complaints regarding civil rights. Mr. Johnson was aware these procedures were in place. (Id. at 11-12.)

Finally, concerning the incident with Ricky Tolbert, while Mr. Tolbert's conduct was certainly unwelcome, Mr. Johnson cannot show that Mr. Tolbert's conduct was (1) based on his race or (2) severe and pervasive. Mr. Johnson acknowledged that he may have "dozed off" before Mr. Tolbert kicked him:

> I might have fell off to sleep, but immediately when he kicked me, he got my attention because the way that I was hit by the foot. It got my attention when I was sleeping. Now, he got my - but now, I might have been dozed off and he might have took that I was dozed off and was waking me up to let me know that it was about time to go.

(Johnson Dep. 113-14.) Thus, Mr. Johnson admits that Mr. Tolbert may have kicked him because he thought he was asleep and wanted to alert him to the fact that their shift was about to start. During his deposition, Mr. Johnson refers to an incident where another black employee was kicked by a white co-worker and uses this incident in support of his claim that Mr. Tolbert kicked him because he is

black.  (Id. at 102-03.)  However, it is Mr. Johnson's personal experience that is relevant for the purposes of his hostile work environment claim.  See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004) ("[There is no evidence in the record, nor does [Plaintiff] allege, that [Defendant] or anyone else directed any racially-offensive conduct at [Plaintiff] himself.  [Plaintiff] makes much of the treatment of other Booz Allen employees, but we focus on [Plaintiff's] personal experience.").  Finally, this lone incident cannot be described as sufficiently severe and pervasive so as to alter the conditions of Mr. Johnson's employment.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that "isolated incidents" will generally not meet requisite threshold of severity or pervasiveness).

B.

Mr. Johnson's next claim concerns his contention that white employees were given more opportunities for overtime work than African American employees at the Badin Works.  (Johnson Dep. 127.)  To establish a prima facie case of race discrimination with respect to the assignment of overtime, Mr. Johnson must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside his protected class received more favorable treatment.  White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir.

26

2004) (citations omitted).

Mr. Johnson has not shown that he suffered an adverse employment action or that a similarly-situated white employee was given more favorable treatment with respect to the assignment of overtime. During his deposition, he was asked to describe a specific occasion when he was overlooked for overtime. (Johnson Dep. 128.) Mr. Johnson responded that "a few years ago . . . Reggie Almond once got overtime and I felt like, and according to the overtime list, I should have gotten - I should have gotten it." (Id. at 128-29.) A few days later, Mr. Johnson discussed his concerns with his Supervisor who told him that he had assigned the overtime shift correctly. (Id. at 129.) Mr. Johnson did not file a grievance about this incident because he had "just simply forgotten about it." (Id.) Mr. Johnson has not provided any evidence that (1) he was entitled to this overtime shift but did not get it or (2) Mr. Almond was not entitled to this overtime shift. Mr. Johnson's unsupported allegations are not sufficient to support a finding that a genuine issue of material facts exists as to whether he was discriminated against in the assignment of overtime. See Anderson, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.") (citations omitted); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.") (citation omitted).

C.

Mr. Johnson also alleges that he should have been admitted to the Accelerated Apprenticeship Program. To establish a prima facie case in the context of a failure to promote claim, Mr. Johnson must show that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) was rejected under circumstances giving rise to an inference of unlawful discrimination. Carter, 33 F.3d at 458.

Mr. Johnson contends that he "completed a card for the program but for some reason, it was not recognized. To correct the situation, [I] was told by the Human Resource Manager, Roy [sic] Persons, that [I] would receive the next opening in the program." (Johnson Aff. ¶ 3, Aug. 3, 2006.) However, viewing the facts in the light most favorable to the non-moving party, Mr. Johnson has not established that (1) he was qualified for a position in the program or that (2) he was rejected under circumstances giving rise to an inference of discrimination.

In order to be accepted into the Accelerated Program, an employee had to have some prior training or experience in craft skills, welding, pipe fitting, hydraulic maintenance, auto mechanics, or electrical maintenance.[10] (Dahlberg Aff. ¶ 10, Feb. 11, 2003; Gibson Aff., Aug. 1, 2006, Ex. 1.) However, Mr. Johnson has not

---

[10] The "blue sheet" that employees were required to complete when applying to the Accelerated Program requested that the applicant include information regarding his or her prior training or experience in these areas. (See Def.'s Mem. Supp. Summ. J., Ex. 65.)

28

provided any evidence that he had any experience in any of these areas and thus was qualified for admission to the Accelerated Program. In addition, although Mr. Johnson contends that "[e]mployees with less seniority than I had were accepted into the program and I was not," (Johnson Aff. ¶ 3, Aug. 3, 2006), he has not put forward any evidence that he was rejected under circumstances giving rise to an inference of unlawful discrimination. Indeed, one of the employees that Mr. Johnson contends should not have been admitted to the Program is African American. (Id. ¶ 3.) Moreover, of the thirty-four employees who applied for admission to the Accelerated Program, ten were black and twenty-four were white. Ultimately, six employees were offered positions in the Accelerated Program and of these, three were black and three were white. This fact belies Mr. Johnson's claim that he was denied admission to the Accelerated Program under circumstances giving rise to an inference of discrimination.

E.

Finally, Mr. Johnson alleges that he was disciplined in a discriminatory manner when Larry Phillips, the Superintendent of the Potroom, suspended him for five days in 1999. To establish a prima facie case of discriminatory discipline, a plaintiff must show (1) he is a member of a protected class, (2) he engaged in misconduct as serious as that of an employee who was not a member of a protected class and (2) the employer imposed harsher disciplinary measures against the plaintiff than against employees outside the protected class. Carter, 33 F.3d at

29

460.  In order to meet this burden, the plaintiff must show that an employee who was not a member of a protected class engaged in acts of "comparable seriousness" in violation of the employer's rules and was not disciplined in as severe a manner as the plaintiff.  Moore v. City of Charlotte, NC, 754 F.2d 1100, 1107 (4th Cir. 1985) (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976)).

Mr. Johnson has not provided any evidence that a white employee who committed a comparable violation of Alcoa's workplace rules received a less severe disciplinary treatment as a result.  Thus, he has not established a prima facie case of discriminatory discipline.  See Moore, 754 F.2d at 1105-06.

Moreover, during his deposition, when asked why he thought this incident constituted racial discrimination, Mr. Johnson responded:

> Because I simply got up and walked out when I had rights to walk out at the end of my shift, and I was charged with insubordination, meaning that I disobeyed management orders, and I interfered with an investigation that was doing.  And second, I – I – I do feel like he did that because I was black.  And after that incident, this same Larry Phillips superintendent had made a statement to a white employee, you better be glad you ain't a black man.

(Johnson Dep. 92.)  Mr. Johnson's answer contains three parts: (1) he felt like it was his "right" to leave Mr. Phillips office at the end of the shift; (2) he "feels like" Mr. Phillips punished him because he was black; and (3) later, Mr. Phillips said "You better be glad you ain't a black man," to a white employee.  The first two parts of Mr. Johnson's comment do not establish that Mr. Johnson's suspension

was due to his race.  Mr. Phillips obviously felt that Mr. Johnson was acting

improperly when he left his office on two occasions during their initial interview

and again when Mr. Johnson went back to his car to get his lunch before the

midnight shift.  As Mr. Johnson's supervisor, this was his decision to make.  See

Hawkins v. PepsiCo, Inc., 203 F.3d 274, 282 (4th Cir. 2000) (citing Johnson v.

Merrell Dow Pharms., Inc., 965 F.2d 31, 34 (5th Cir. 1992) ("In order to properly

manage its business, an employer must be able to supervise, review, criticize,

demote, transfer and discipline employees.").  Moreover, Mr. Johnson cannot

simply conclude that Mr. Phillips actions were due to race; instead he must provide

legally sufficient evidence of discrimination.  See Hawkins, 203 F.3d at 282 (citing

Gairola, 753 F.2d at 1285 (evidence is legally insufficient if verdict for party

offering that evidence would necessarily be based on speculation and conjecture)).

The final portion of Mr. Johnson's statement refers to a conversation he had

with Mr. Phillips in May of 2000, after Mr. Tolbert kicked his foot to wake him

while he was dozing in the canteen.  According to Mr. Johnson, he confronted Mr.

Phillips about this statement during the meeting, saying, "[T]here's been a

statement made by management that a white employee's been told, you better be

glad you ain't a black man."  (Johnson Dep. 93.)  Mr. Phillips admitted to Mr.

Johnson that he had made the statement, but said he had been "misinterpreted."

(Id.)  Thus, Mr. Johnson was not present when the statement was originally made

and is only aware that Mr. Phillips made the statement because he admitted doing

31

so to Mr. Johnson.  (Id. at 105-06.)  Mr. Johnson does not know when Mr. Phillips made the statement but believes him to have said it sometime during the year 2000.  (Id. at 1110-11.)

Mr. Johnson appears to offer this statement as direct evidence of discrimination.  However, when using direct evidence to survive a motion for summary judgment, the plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action."  Diamond v. Bea Maurer, Inc., 128 Fed. Appx. 968, 971 (4th Cir. Apr. 25, 2005) (unpublished opinion) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999)).

Mr. Johnson has not put forward any evidence that a nexus exists between the comment Mr. Phillips made sometime in 2000 and the five day suspension he received in 1999.  The events in question are more than a year apart and Mr. Phillips made the comment at least one year *after* he suspended Mr. Johnson for insubordination.  See Brinkley, 180 F.3d at 608 (finding that where plaintiff produced "a few isolated statements indicating sexist attitudes" at defendant's workplace, but failed to connect the statements with her eventual termination, she could not survive summary judgment on the basis of direct evidence).

Finally, Mr. Johnson relies upon the findings of the United States Department of Labor, Employment Standards Administration, Office of Federal Contract Compliance Programs (the "OFCCP"), in support of his contention that he

32

was discriminated against when Mr. Phillips suspended him in 1999.  (See Pl.'s

Supp. Submission, Ex. B & C.)  Assuming the OFCCP findings are admissible, see

Chandler v. Roudebush, 425 U.S. 840, 863 n.39 (1976); Halloway v. Milwaukee

County, 180 F.3d 820, 827 n.9 (7th Cir. 1999), they are still not sufficiently

probative to establish Mr. Johnson's prima facie case of discriminatory discipline.

The reports merely restate Mr. Johnson's allegations and then conclude that these

allegations support a finding of discrimination.  See Pl.'s Supp. Submission, Ex. B

at 2-3; Ex. C at 10-12; see also Goldberg v. B. Green & Co., 836 F.2d 845, 848

(4th Cir. 1988) ("[W]e must conclude that the Commission's findings are not

sufficiently probative to create a genuine issue of material fact about [Defendant's]

intent to discriminate on the basis of age.  The Commission's report merely repeats

facts which [Plaintiff] himself alleges elsewhere in this case, and then states in a

conclusory fashion that those facts reflect age discrimination.").

IV.

Thus, after taking each incident Mr. Johnson has identified as discriminatory

and considering the evidence relating to it, the briefs, and oral argument of

counsel, it is determined that Mr. Johnson has failed to establish a prima facie case

with regard to any of the alleged incidents of discrimination that he has described.

Regarding the presence of the Confederate flag on vehicles in the Badin Works'

parking lots, the presence of racially offensive symbols in the Badin Works, and the

incident where he was kicked by a white co-worker, Mr. Johnson has failed to

33

show (1) that any of these incidents were sufficiently severe and pervasive to alter the conditions of his employment or (2) there is some basis for imposing liability on Alcoa because of these incidents.  Mr. Johnson has also failed to establish that (1) he was the victim of an adverse employment action in connection with his claim that he was not given the same opportunity to work overtime shifts as white employees were or (2) a similarly-situated white employee was given an overtime shift that he was entitled to.  He has also failed to establish that he was qualified for admission to Alcoa's Accelerated Apprenticeship Program or that he was denied admission to the Program under circumstances giving rise to an inference of discrimination.  Finally, Mr. Johnson has failed to show that he was treated more harshly than a similarly situated white employee with regard to the five-day suspension he received in 1999.

Accordingly, for the reasons set forth above, Alcoa's Motion for Summary Judgment as to Plaintiff Emory Johnson, Jr. [Doc. # 75] will be GRANTED.

This the day of August 29, 2006

    /s/ N. Carlton Tilley, Jr.   
United States District Judge

34